REVISED MARCH 10, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 17, 2009

Charles R. Fulbruge III
Clerk

No. 07-50632

HARVEY LEROY SOSSAMON, III

Plaintiff-Appellant

v.

THE LONE STAR STATE OF TEXAS; CHRISTINA MELTON CRAIN;
CATHY CLEMENT; BRAD LIVINGSTON; DOUG DRETKE; R.G. MURPHY;
ROBERT EASON; STACY L. JACKSON; PAUL J. KLIEN; NATHANIEL
QUARTERMAN

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge.

We are asked today to resolve a number of questions concerning the extent to which, based on the special considerations we afford the government in its role as jail-keeper, we will excuse the intrusion of a state, here Texas, on the free exercise of religion by prisoners. We must also address several issues surrounding the remedies available when such an intrusion proves too great to excuse. Convinced that the Religious Land Use and Institutionalized Persons Act ("RLUIPA") demands less intrusion than Texas exercised in one area, we

reverse and remand in part; but, discerning no error otherwise, and taking note of the accommodations that Texas has offered the Plaintiff-Appellant Harvey Leroy Sossamon, III during the pendency of this appeal, we also affirm in part and dismiss some of his claims as moot with instructions to vacate.

## I. FACTS AND PROCEEDINGS

Sossamon is an inmate of the Robertson Unit of the Texas Department of Criminal Justice (the "TDCJ") — Correctional Institutions Division. He alleges that (1) he has been deprived of access to Robertson's chapel for purposes of his Christian worship (the "chapel-use" claim or policy) and (2) while on cell restriction, he was forbidden to attend any worship services at all (the "cell-restriction" claim or policy).

Concerning the chapel-use claim, Sossamon provided competent summary judgment evidence that he is denied access to Robertson's chapel for Christian worship and that the venues for such worship offered as alternatives to the chapel do not have Christian symbols or furnishings, such as an altar and cross, which "have special significance and meaning to Christians." This, he insists, prevents him from "kneeling at the alter [sic] in view of the Cross, to pray, or receive holy communion in obedience to Christ Jesus['s] command, to observe the Lord's Supper, by Christian ceremony, in remembrance of the divine sacrifice the Lord God made, for the atonement of plaintiff's sins at Calvary." Sossamon contends that even if this were not so, services and Bible study at the alternative venues are frequently interrupted by security personnel or noise from the prison yard. He alleges that if worshipers refuse to end their prayer or devotion and return to work when ordered, they are subjected to harassment and retaliation by prison guards, such as by strip searches.[1] He surmises that the prison has

---

[1] Sossamon does not allege that he has been subjected to a strip search and did not file an administrative grievance of this matter to the prison, as required by the Prison Litigation Reform Act ("the PLRA").

"evict[ed] and throw[n] God[] out of his house." According to Sossamon, this is not so for Muslim prisoners, whom he claims are provided special accommodations for worship, along with special meals, that Christians are not.

Concerning the cell-restriction claim, Sossamon has provided competent summary judgment evidence that inmates on cell restriction for disciplinary infractions were not permitted to attend religious services at all, even though they were permitted to attend work, to eat, to shower, to have medical lay-ins, to attend educational classes, to use the law library, and to participate in other secular activities. On September 15, 2005, Sossamon, who had been found guilty of a minor rule infraction, was placed on cell restriction for fifteen days. During that time, he was twice denied permission to attend religious services.

Based on these allegations, Sossamon proceeded pro se against the "Lone Star State of Texas" and a number of individuals involved in the TDCJ[2] (collectively referred to as "Texas") under: (1) 42 U.S.C. § 1983, for violations of

---

[2] They are: Christina Melton Crain (Chair of the Texas Board of Criminal Justice), Cathy Clement (Assistant Regional Director for Region VI of the TDCJ), Brad Livingston (Executive Director of the TDCJ), Doug Dretke (former Director of the TDCJ - Correctional Institutions Division; Nathaniel Quarterman, the current Director, automatically replaced Dretke as the defendant against whom the official-capacity claims are brought, see FED. R. APP. P. 43(c)(2)), Reverend R.G. Muphy (Region V Program Administrator for the Chaplaincy Department, Rehabilitation, and Reentry Programs Director of the TDCJ), Robert Eason (Senior Warden of Robertson), Stacy Jackson (Assistant Warden of Robertson), and Paul Klein (a volunteer chaplain at Robertson). All were sued in their personal and official capacities. Sossamon subsequently moved to dismiss all of his TRFRA individual-capacity claims against all defendants and to dismiss all claims against Murphy, Jackson, and Klein. Those motions were granted. The notice of appeal erroneously listed those defendants as parties, so they appear in our caption, but we note that they are now non-parties over whom we have no jurisdiction. See Castillo v. Cameron County, Tex., 238 F.3d 339, 349-50 (5th Cir. 2001).

his First, Eighth,[3] and Fourteenth Amendment rights; (2) RLUIPA;[4] and (3) the Texas Religious Freedom Restoration Act ("TRFRA").[5]  He sought declaratory and injunctive relief against the defendants in their official capacities, along with compensatory and punitive damages from them in their official and individual capacities.

The parties cross-moved for summary judgment.  On the cell-restriction policy, Texas noted that after Sossamon filed a grievance on this issue, the warden at Robertson amended the local cell-restriction policy by allowing prisoners at Sossamon's custody level (G-3) to attend worship services while on cell restriction.  The Director of the Correctional Institutions Division of the TDCJ, Nathaniel Quarterman, submitted an affidavit during the pendency of this appeal advising that the TDCJ has adopted Robertson's relaxation of the cell-restriction policy for all Texas correctional facilities.

On the chapel-use claim, Texas concedes that Sossamon — like all other prisoners — has been denied access to the Robertson chapel for congregational religious services during the entirety of his incarceration at Robertson.  In fact, all religious worship is now prohibited at the chapel.  The Senior Warden of

---

[3]  The Eighth Amendment claim is completely abandoned on appeal.  Mindful of our responsibility to construe pro se filings liberally, see Al-Ra'id v. Ingle, 69 F.3d 28, 31 (5th Cir. 1995), we nevertheless point out that the claim fails under the test announced in Farmer v. Brennan, 511 U.S. 825, 834 (1994). Sossamon has not demonstrated that the chapel-use policy and the cell-restriction policy deprive him of "the minimal civilized measure of life's necessities."  Id.

[4]  42 U.S.C. §§ 2000cc to 2000cc-5 (2006).

[5]  TEX. CIV. PRAC. & REM. CODE ch. 110 (Vernon 2007).  This claim has been abandoned on appeal.  Again mindful of our duty to construe his briefs liberally, we point out that state law cannot be the basis on which a federal court either enters an injunction or an award of monetary relief against a state.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984) ("The reasoning of our recent decisions on sovereign immunity thus leads to the conclusion that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment.").  As Sossamon dismissed all of his individual-capacity claims under TRFRA, we have no need to further discuss them.

Robertson, Robert Eason, submitted an affidavit justifying this restriction on safety and security grounds. He averred that Robertson has a policy of physically segregating prisoners in different buildings based on a number of factors. In addition to assignment based on custody level, the prison attempts to suppress gang activity by assignments to different buildings based on gang affiliations. Warden Eason contends that allowing prisoners to gather in one location would undercut his policy of segregating hostile gang members. Also, moving prisoners from building to building taxes the staff and creates security risks, problems that are exacerbated by Robertson's security-personnel staffing levels, which are typically below authorized strength because the work is difficult and the pay is low. By providing religious services at alternative locations[6] — such as in Building 4 of Robertson, where Sossamon is currently housed — prisoners need not be moved from one building to another, thereby relaxing the demands on security personnel and reducing the amount of interaction among segregated prisoners.

Warden Eason also averred that the chapel poses special security concerns. Chaplains and religious volunteers would have to walk through groups of prisoners to lead services from the front of the room. If an incident were to occur, the religious personnel could be trapped. The location of the chapel in the main administrative building also exposes the non-security personnel of the prison (such as secretaries and support staff) to the risk of an incident. Further, the main administrative building has storage spaces that could be used for hiding weapons and contraband. Warden Eason based his concerns in part on his personal experience: While serving as a captain at a

---

[6] Texas offered competent summary judgment evidence that "numerous hours of religious services and instruction [other than at the chapel] are provided to inmates sharing [Sossamon's] faith." The district court also found that "it is clear . . . [that prisoners have] access to religious books and materials . . . for the practice of their faith."

correctional facility, a difficult-to-control riot broke out in a chapel with a design similar to that of the Robertson chapel.

Finally, Warden Eason noted that the Robertson chapel can hold only around 75 people at a time, which makes it too small to hold the number of prisoners who routinely attend non-Roman Catholic Christian services. Instead, according to Warden Eason, the prison uses the chapel as a library for religious books, a meeting place for staff, and a facility for teleconferencing. Regarding the merits of Sossamon's claimed need for access to the chapel, the prison chaplain averred that "it is not a basic tenant [sic] of the Christian faith that services must be held in particular locations."

Sossamon replied to Warden Eason's assertions. In an affidavit, he contended that a number of the non-religious purposes for which the chapel is used present the same security risks as would religious services. For example, he contends that the chapel is used for "teaching convicted sexual predators and child molesters how to practice safe sex at TDCJ-sponsored 'Peer Education' classes." These classes are taught by a "small petite" female security officer who is "left alone with a group of men, and groups of men attending these classes are some times [sic] left unsupervised in the chapel." He also contends that prisoners "can enter the chapel for marriage seminars that begin on Friday afternoon and last until Sunday. During these seminars[,] prisoners['] wives are allowed to spend up to twelve (12) hours inside the chapel with them." Prisoners who obtain a GED are given a celebration inside the chapel, "including contact visits with free world members of their family and with friends." Finally, he alleges that prisoners are permitted to use the chaplain's office to make phone calls at night, but not to enter the chapel and pray at the cross.

The district court granted summary judgment to the defendants, reasoning that (1) Eleventh Amendment sovereign immunity bars Sossamon's claims for monetary relief from Texas and the defendants in their official capacities, (2) the

defendants are entitled to qualified immunity from suit for damages in their individual capacities because no violation of Sossamon's rights occurred, and (3) Sossamon did not demonstrate that injunctive relief under TRFRA or his federal claims is proper. The district court also refused to appoint counsel. This timely appeal followed, and we appointed appellate counsel.

## II. ANALYSIS

1. Mootness

   a. Standard of Review

We review de novo matters of justiciability, such as mootness, that affect our jurisdiction to hear a case.[7]

   b. Merits

Texas contends that Sossamon's claims for injunctive relief based on Robertson's cell-restriction policy are moot because Director Quarterman has certified that Texas has ended the policy of preventing general-population prisoners on cell restriction from attending religious services. We were apprised of the change in policy and Texas's argument that Sossamon's injunctive-relief claims are now moot in a Federal Rule of Appellate Procedure 28(j) letter accompanied by an affidavit from Director Quarterman. As support for the conclusion that its voluntary cessation of the challenged conduct moots the case, Texas cites Staley v. Harris County, Texas, in which we held that an appeal raising First Amendment challenges to a New Testament Bible monument became moot after the defendant, Harris County, Texas, removed the monument.[8] We further held in Staley that any concern about a possible

---

[7] United States v. Lares-Meraz, 452 F.3d 352, 355 (5th Cir. 2006) (per curiam).

[8] 485 F.3d 305, 309 (5th Cir. 2007) (en banc) (citing Harris v. City of Houston, 151 F.3d 186, 189 (5th Cir. 1998) ("[W]e find it beyond dispute that a request for injunctive relief generally becomes moot upon the happening of the event sought to be enjoined.")).

redisplay of the monument in the future was not yet ripe because "there are no facts before us to determine whether such a redisplay might violate the Establishment Clause."[9]

If the controversy between Sossamon and Texas has resolved to the point that they no longer qualify as "adverse parties with sufficient legal interests to maintain the litigation," we are without power to entertain the case.[10] This general rule is subject to several important exceptions however. For example, the voluntary cessation of a complained-of activity by a defendant ordinarily does not moot a case: If defendants could eject plaintiffs from court on the eve of judgment, then resume the complained-of activity without fear of flouting the mandate of a court, plaintiffs would face the hassle, expense, and injustice of constantly relitigating their claims without the possibility of obtaining lasting relief.

The Supreme Court has recently addressed this exception to mootness. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, the Court said that "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."[11] Further, "the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be

---

[9]  Id.

[10]  Lares-Meraz, 452 F.3d at 354 (internal quotation marks omitted).

[11]  528 U.S. 167, 189 (2000) (internal quotation marks omitted).

expected to recur."[12] This is a "heavy burden," which must be born by the party asserting mootness.[13]

On the other hand, courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity[14] — a practice that is reconcilable with Laidlaw. Although Laidlaw establishes that a defendant has a heavy burden to prove that the challenged conduct will not recur once the suit is dismissed as moot, government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties. Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing.

Under this lighter burden to make "absolutely clear" that the cell-restriction condition cannot "reasonably be expected to recur," Director Quarterman's affidavit is sufficient. In it, he swears that the he is the party responsible for enforcing administrative directives of the TDCJ, that the Executive Director of the TDCJ revised the relevant administrative directive, and that prisoners on cell restriction will now be permitted to attend religious services. Any claim that Sossamon might be removed from the general population is too speculative to avoid mooting the case; we cannot foresee how

---

[12] Id.

[13] Id.

[14] See, e.g., Zepeda v. Boerne Indep. Sch. Dist., 294 F. App'x 834, 840 n.9 (5th Cir. 2008) (unpublished) (citing McCrary v. Poythress, 638 F.2d 1308, 1310 & n.1 (5th Cir. 1981); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988); 13A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.7 n.6 (West 2008)). Our case that Zepeda cites pre-dates Laidlaw and only cites to a Supreme Court case that dealt with the "capable of repetition, yet evading review" exception, not the voluntary-cessation exception to mootness. The Seventh Circuit case Zepeda cited is on point.

a claim made by a prisoner presenting special security concerns may differ. Further, the fact that the change in policy is now state-wide obviates any concern that local prison officials might change their minds on a whim or that Sossamon might be transferred to a facility with different rules.

We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct. The good faith nature of Texas's cessation is buttressed by the fact that Sossamon did not obtain relief below. Had the trial court granted the injunction, we might view any attempt to force a vacatur of such a determination (particularly in favor of a pro se prisoner) with a jaundiced eye. As things stand, Texas has given Sossamon that which he did not obtain in the district court and that which there at least existed a possibility he might not have obtained here. We therefore dismiss as moot those parts of the appeal that relate to Sossamon's claims for injunctive and declaratory relief from the erstwhile cell-restriction policy (but not his claims for damages based on the September 2005 enforcement of that restriction) with instructions that the district court vacate these portions of its opinion as well.[15]

2.   RLUIPA

   a.   Standard of Review

We review a district court's grant of summary judgment (and a district court's statutory interpretation) de novo, using the same standards as the

---

[15] The rule of automatic vacatur after a finding of mootness on appeal, best expressed in United States v. Munsingwear, Inc., 340 U.S. 36, 39 (1950), was rejected by the Supreme Court in U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18, 23-24 (1994). Instead, a vacatur, which is an "extraordinary" and equitable remedy, is to be granted only after a fact-specific balancing of the equities between the parties. Bancorp, 513 U.S. at 26. When, however, a party who prevailed below makes the case moot by his unilateral action, a "vacatur must be granted." Id. at 23.

district court.[16] "Summary judgment [should be granted] when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[17] The movant's initial burden is "to demonstrate that no genuine issue of material fact exists."[18] If the movant satisfies that initial burden by establishing the "absence of evidence to support an essential element of the non-movant's case, the burden shifts to the party opponent to establish that there is a genuine issue of material fact."[19]

"An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."[20] "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."[21] At summary judgment, we construe facts in the light most favorable to the non-moving party.[22]

b.    Merits

Sossamon seeks damages and equitable relief under RLUIPA from Texas and from the defendants in their individual and official capacities for the enforcement of the cell-restriction and the chapel-use policy against him. To address these claims, we must confront several issues that we have previously left unresolved. We must now determine (1) what, if any, private rights of action does RLUIPA create, (2) what are the limits on any such private rights of action

---

[16] FED. R. CIV. P. 56(c); Condrey v. SunTrust Bank of Ga., 429 F.3d 556, 562 (5th Cir. 2005).

[17] Condrey, 429 F.3d at 562 (internal quotation marks omitted).

[18] Id.

[19] Id.

[20] Hamilton v. Segue Software, Inc., 232 F.3d 473, 477 (5th Cir. 2000) (per curiam).

[21] Id.

[22] Connors v. Graves, 538 F.3d 373, 376 (5th Cir. 2008).

in light of the sovereign immunity enjoyed by states, and (3) what is the interaction between the PLRA and the rights created by RLUIPA.

We begin with a preliminary observation: RLUIPA unambiguously creates a private right of action for injunctive and declaratory relief. In 42 U.S.C. § 2000cc-2(a), Congress granted prisoners permission to "assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." No decision cited by the parties and none of which we are aware holds that RLUIPA's "appropriate relief" language fails to confer an individual right to pursue declaratory and injunctive relief. We therefore address whether RLUIPA also authorizes suits for damages against (1) RLUIPA defendants in their individual capacities or (2) the state and its officers in their official capacities, or both. We address each damages question in turn before addressing Sossamon's claims for injunctive and declaratory relief.

A number of circuits appear to have assumed that an individual-capacity cause of action for damages exists because the courts have conducted, or on remand have required that the district court conduct, a qualified immunity analysis.[23] Some circuits have also reached the PLRA issue and held that, because it bars compensatory damages absent physical injury, the question about RLUIPA's remedial scope is irrelevant.[24] Of course, if no private right of

---

[23] The Ninth Circuit appears to have assumed that a cause of action for monetary relief against state actors in their individual capacities exists, but its cases contain no analysis and are unpublished. See Campbell v. Alameida, 295 F. App'x 130, 131 (9th Cir. 2008) (mem.) (unpublished); Von Staich v. Hamlet, Nos. 04-16011 & 06-17026, 2007 WL 3001726, at *2 (9th Cir. Oct. 16, 2007) (mem.) (unpublished). The Third Circuit has declined to address the issue. Brown v. Dep't of Corr., 265 F. App'x 107, 111 n.3 (3d Cir. 2008) (per curiam) (unpublished) ("We also find it unnecessary to reach the questions whether individuals may be liable for monetary damages under the RLUIPA and whether qualified immunity applies here."). The Fourth Circuit noted a split in the district courts over the issue, but did not resolve it. Madison v. Virginia, 474 F.3d 118, 130 n.3 (4th Cir. 2006).

[24] See cases cited supra note 23. This is not true as a general proposition, although it appears to have been accurate for the case that held as much, i.e., the plaintiffs did not request nominal or punitive damages, which are the only damages absent physical injury that the

action exists against the defendants in their individual capacities, then a qualified immunity or PLRA analysis would be unnecessary. In Mayfield v. Texas Department of Criminal Justice, the only case in which we have examined this issue, we appeared to countenance the idea that a cause of action exists, but then expressly declined to resolve the issue.[25] We will assume that if RLUIPA creates an action against defendants in their individual capacities, then it provides for damages.[26] For the reasons that we explain below, we decline to find any authority for individual-capacity actions in the statute.

The Eleventh Circuit is the only circuit that has resolved this issue. After acknowledging a split in the district courts, Smith v. Allen held that RLUIPA does not provide for damages from individuals.[27] The plain language of RLUIPA, however, seems to contemplate such relief. Despite providing a cause of action for suits against "a government," the definition of government provided by the statute is expansive.[28] The term "government" means:

> (i) a State county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in [that] clause . . . ; and (iii) any other person acting under color of state law . . . .[29]

---

PLRA does not bar. See Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 605-06 (5th Cir. 2008).

[25] 529 F.3d 599 at 605-06 & n.8.

[26] See Smith v. Allen, 502 F.3d 1255, 1272 (11th Cir. 2007). For example, the Smith court noted that the Supreme Court has instructed us to "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise" or given guidance by a "clear indication of its purpose with respect to remedies." Id. at 1270 (internal quotation marks omitted). There is no clear or express indication in RLUIPA that damages are unrecoverable.

[27] Id.

[28] 42 U.S.C. § 2000cc-2(a) (2006).

[29] Id. § 2000cc-5 (emphases added).

Smith acknowledged that this language appears to create a right against state actors in their individual capacities. It even mirrors the "under color of" language in § 1983, which we know creates an individual-capacity cause of action for damages.[30]

In holding that individuals may nevertheless not be sued for damages under RLUIPA, the Eleventh Circuit added an important gloss to a plain-language interpretation of the statute: RLUIPA was enacted pursuant to Congress's Spending Clause power, not pursuant to the Section 5 power of the Fourteenth Amendment.[31] Accordingly, only the grant recipient — the state — may be liable for its violation.[32] Spending Clause legislation is not legislation in its operation; instead, it operates like a contract,[33] and individual RLUIPA defendants are not parties to the contract in their individual capacities.

We too conclude that RLUIPA, at least as Sossamon asserts a claim under it, was passed pursuant to the Spending Clause,[34] and we too follow the same

---

[30] See, e.g., Monroe v. Pape, 365 U.S. 167, 172 (1961), overruled on other grounds by Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

[31] See Cutter v. Wilkinson, 544 U.S. 709, 715-16 (2005) (mentioning the Spending and Commerce Clauses); Smith, 502 F.3d at 1274 n.9 (Spending Clause only).

[32] Smith, 502 F.3d at 1272-73.

[33] See Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981).

[34] Every circuit to consider whether RLUIPA is Spending Clause legislation has concluded that it is constitutional under at least that power. See Madison v. Virginia, 474 F.3d 118, 124 (4th Cir. 2006) (approving of enactment under the Spending Clause, but not passing on a Commerce Clause authority); Cutter v. Wilkinson, 423 F.3d 579, 584-90 (6th Cir. 2005) (same); Benning v. Georgia, 391 F.3d 1299, 1313 (11th Cir. 2004) (same); Charles v. Verhagen, 348 F.3d 601, 606-11 (7th Cir. 2003) (same); Mayweathers v. Newland, 314 F.3d 1062, 1066-70 (9th Cir. 2002) (same). Only the Eleventh Circuit has explicitly held that RLUIPA is Spending, not Commerce, Clause legislation. Smith, 503 F.3d at 1274 n.9. In light of the Supreme Court's rationale for striking down the prior incarnation of RLUIPA as applied to the states, see Cutter, 544 U.S. at 715 (characterizing City of Boerne v. Flores, 521 U.S. 507, 532-36 (1997), the case that struck down the Religious Freedom Restoration Act ("RFRA"), as focusing on the absence of a Commerce Clause underpinning or Spending Clause limitation), we agree with the Eleventh Circuit's conclusion (and the implicit conclusion of the other circuits by their

14

rule for such legislation.[35] The legislation/contract distinction makes good sense — if a congressional enactment could provide the basis for an individual's liability based only on the agreement of (but not corresponding enactment of legislation by) a state, then important representation interests protected by federalism would be undermined. After passively acquiescing in the regulation of its citizens under a federal standard to receive needed funding from Congress, a state legislature could point its finger at the federal government for tying needed funds to an undesired liability — the regulation or law responsible for such liability not having been enacted by the state. Congress could reciprocate by pointing its finger at the state legislature for accepting the funds and visiting liability on its citizens by the state's own choice, even though the state itself did not enact the law or regulation in question. Such an approach blurs the lines of decisional responsibility; that, in turn, undermines the popular check on both state and federal legislatures. We therefore make explicit that which was implicit in our earlier cases: Congressional enactments pursuant to the Spending Clause do not themselves impose direct liability on a non-party to the contract between the state and the federal government.[36] Cases like South

---

uniform choice to select the Spending Clause as the most natural source of congressional authority to pass RLUIPA) when there is no evidence concerning the effect of the substantial burden on "commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc-1(b)(2).

[35] See Pederson v. LSU, 213 F.3d 858, 876 (5th Cir. 2000) ("Title IX is Spending Clause legislation, and as a statute enacted under the Spending Clause, Title IX generates liability when the recipient of federal funds agrees to assume liability." (emphasis added) (citing Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 654 (5th Cir. 1997))). In fact, Smith cited Rosa H. as support for its conclusion. 502 F.3d at 1274.

[36] Cf. Pennhurst, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accept[ed] the terms of the 'contract.'" (emphasis added)). Perhaps there is an argument to be made that by accepting employment in a federally funded state enterprise, a state official becomes a third-party beneficiary to the contract, or knowingly and voluntarily subjects himself to liability. Sossamon does not make this argument.

15

Dakota v. Dole, despite its lax approach to indirect legislation (such as requiring that a state itself pass a particular law) under the Spending Clause, were clearly intended to prevent — in spirit, if not by doctrine — this type of end-run around the limited powers of Congress to directly affect individual rights.[37] To decide otherwise would create liability on the basis of a law never enacted by a sovereign with the power to affect the individual rights at issue. For this reason, as a matter of statutory interpretation and to avoid the constitutional concerns that an alternative reading would entail, we decline to read Congress's permission to seek "appropriate relief against a government" as permitting suits against RLUIPA defendants in their individual capacities.

Having concluded that an action under RLUIPA does not exist for individual-capacity claims, we will assume arguendo that an official-capacity damages action exists. Whether or not RLUIPA creates such a cause of action, it is barred by Texas's sovereign immunity. As we noted above, RLUIPA was passed pursuant to the Spending Clause. It is therefore not an attempt by Congress to abrogate Texas's sovereign immunity, but to goad Texas to waive its sovereign immunity by accepting federal funds conditioned on accepting

---

[37] 483 U.S. 203 (1987).

liability.[38]  We recently declined to address this issue,[39] and there is a circuit split on the question.  In Benning v. Georgia, the Eleventh Circuit concluded that a state waives its sovereign immunity by participating in RLUIPA's quid pro quo.[40]  In Madison v. Virginia, the Fourth Circuit reached the opposite conclusion.[41]

When deciding the validity of a putative waiver of sovereign immunity through a state's participation in a Spending Clause "contract," we ask whether Congress spoke with sufficient clarity to put the state on notice that, to accept federal funds, the state must also accept liability for monetary damages.[42]  The Eleventh Circuit did not dwell long on whether the phrase "appropriate relief" unambiguously notified Georgia that its acceptance of federal funds was conditioned on a waiver of immunity from suit, holding that it did.[43]  Against a

---

[38] Sossamon's supplemental brief, prepared by the counsel we appointed him, contends that Texas waived its sovereign immunity for this case by requesting attorneys' fees in its answer to the original complaint.  For this proposition, the brief cites Powell v. Texas Department of Criminal Justice, 251 S.W.3d 783, 791 (Tex. App.–Corpus Christi 2008, pet. filed).  Our waiver inquiry is limited by the Supreme Court to determining whether the state (1) expressly consented to suit in federal court, see Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985), superseded by statute on other grounds as stated in Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 280 n.29 (5th Cir.  2005) (en banc), or (2) waived its sovereign immunity through litigation conduct, for example, by voluntarily invoking a federal court's subject matter jurisdiction, see Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 619 (2002).  Sossamon makes no claim that a request for attorneys' fees in an answer is a voluntary invocation of our subject matter jurisdiction like removal, so his Lapides waiver argument fails.

[39] Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 605 n.8 (5th Cir. 2008) ("However, circuit courts are currently split on whether RLUIPA provides for a waiver of state sovereign immunity. . . . We need not reach [that] issue[] to decide this appeal.").

[40] 391 F.3d 1299, 1305 (11th Cir. 2004).

[41] 474 F.3d 118, 131 (4th Cir. 2006).

[42] See Pennhurst, 451 U.S. at 17 ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." (footnote omitted)).

[43] Benning, 391 F.3d at 1305-06.

challenge that Pennhurst State School & Hospital v. Halderman[44] required more specificity than the quoted language, the Benning court held that "[t]he federal law in Pennhurst was unclear as to whether the states incurred any obligations at all by accepting federal funds, but RLUIPA is clear that states incur an obligation when they accept federal funds."[45]

The Fourth Circuit, we believe properly, continued the analysis where the Eleventh left off, observing that RLUIPA clearly apprises states that they incur an obligation, to wit, amenability to some sort of suit seeking to enforce the rights RLUIPA creates; however, the question then becomes, "Which kind?" To choose between deciding whether Virginia knew that the cause of action envisioned by Congress permitted damages (which is what we read Pennhurst to require) or only knew that it was subjecting itself to equitable remedies, the Madison court turned to the rules of construction found in the Supreme Court's waiver jurisprudence. The court pointed out that any alleged waiver must be strictly construed in favor of the sovereign. Further, the waiver may not be enlarged "beyond what the language requires," and ambiguities must be resolved in favor of immunity.[46] With those principles in mind, the opinion concluded that "appropriate relief" is "subject to more than one interpretation," making the language "open-ended and equivocal."[47] This fell short of the requirement that a textual waiver of immunity must "extend unambiguously to such monetary claims."[48] For the Fourth Circuit, this meant that RLUIPA could not satisfy Dole's requirement that the spending condition be unambiguous. We find the

---

[44] 451 U.S. at 13-14.

[45] Benning, 391 F.3d at 1307.

[46] Madison, 474 F.3d at 131 (citing Lane v. Pena, 518 U.S. 187, 192, 196 (1996)).

[47] Id. at 131-32 (internal quotation marks omitted).

[48] Id. at 131.

Fourth Circuit's reasoning persuasive, although we conclude that the spending provision is not sufficiently clear in light of the Court's sovereign-immunity jurisprudence, rather than, strictly speaking, under Dole.

The rules of construction that the Eleventh Circuit applied to resolve the ambiguities in "appropriate relief" for purposes of the cause-of-action inquiry in Smith disappear when we must interpret an ambiguous provision against the backdrop of a state's sovereign immunity. That is, we must presume that Congress intended to afford all ordinary remedies not expressly disclaimed when we interpret the ambiguous language it uses to create a cause of action.[49] We may not presume the same when we ask whether a state knowingly waived its immunity from damages when damages are not expressly provided. RLUIPA is clear enough to create a right for damages on the cause-of-action analysis, but not clear enough to do so in a manner that abrogates state sovereign immunity from suits for monetary relief.[50] Accordingly, Sossamon's claims for monetary relief from Texas and its officers in their official capacities are barred.

To briefly recap, we hold that whether or not RLUIPA creates a cause of action for damages against Texas and the defendants in their official capacities, any award of damages is barred by Texas's sovereign immunity. We also hold that RLUIPA does not create a cause of action against defendants in their individual capacities. Accordingly, we need not address Texas's PLRA argument for the RLUIPA claims.[51]

---

[49] See Smith v. Allen, 502 F.3d 1255, 1272 (11th Cir. 2007).

[50] Cf. Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-67 (1989) ("This does not mean . . . that we think that the scope of the Eleventh Amendment and the scope of § 1983 are not separate issues. Certainly they are. But in deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it.").

[51] We have conducted the predicate cause-of-action and sovereign immunity inquiries because it is unclear whether or not Sossamon abandoned on appeal his request for punitive damages. The PLRA does not bar punitive damages, so we would have been required to

Even though Sossamon may not recover monetary damages, there are genuine issues of material fact about his entitlement to declaratory and injunctive relief from Texas's chapel-use policy.[52] RLUIPA requires that prison officials refrain from (1) substantially burdening an inmate's free exercise of his religion unless, when strictly scrutinized, (2) the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling interest."[53] The initial burden is on the plaintiff "to demonstrate that the government practice complained of imposes a 'substantial burden' on his religious exercise."[54] Bearing that initial burden requires answering two questions in the affirmative: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial?'"[55]

Religious exercise under RLUIPA is defined very broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[56] A burden is substantial if "it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."[57] A burden is not substantial if "it merely prevents the adherent from

_____

address these questions at least for punitive damages in any event. See Mayfield v. Tex. Dep't of Criminal Justice, 529 F.3d 599, 605-06 (5th Cir. 2008). That we reached the above conclusions for compensatory damages only strengthens the conclusion that punitive damages are (1) unavailable against RLUIPA defendants in their individual capacities and (2) barred by a state's sovereign immunity even if RLUIPA intended to permit them.

[52] As discussed above, any claims for prospective relief based on the old cell-restriction policy are moot.

[53] 42 U.S.C. § 2000cc-1(a) (2006).

[54] Adkins v. Kaspar, 393 F.3d 559, 567 (5th Cir. 2004).

[55] Id.

[56] Id.

[57] Id. at 570.

either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed."[58]

The practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion.[59] Even though the statute by its terms does not exempt rules or regulations simply because they are generally applicable,[60] we observed in Adkins v. Kaspar that the uniformity of a burden is nevertheless relevant.[61] The inquiry is a "case-by-case, fact-specific inquiry," and we have also considered whether the "rule or regulation . . . directly prohibits" the practice.[62]

The compelling-governmental-interest issue is not in significant dispute in this case. Effective and affordable prison security at the chapel is a compelling governmental interest.[63] The phrase "least restrictive means" has its plain meaning.

Concerning the first question in our RLUIPA inquiry, viz., whether the claim involves "religious activity," there can be no serious dispute that Sossamon's claimed need for access to the chapel and its symbols relates to the exercise of his religion. As for the second question, we perceive a genuine issue of material fact whether the chapel-use policy creates a substantial burden on Sossamon's free exercise.

---

[58] Id.

[59] Id.

[60] 42 U.S.C. § 2000cc-1(a) (2006).

[61] Adkins, 393 F.3d at 571.

[62] Id. (emphasis added).

[63] See Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007) ("Courts should apply the compelling governmental interest standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." (internal quotation marks omitted)).

There seems to be no question about the genuineness of Sossamon's claimed desire to appear in front of the cross and altar in a room designated for Christian worship. One of the clerical affidavits submitted by TDCJ points out that Christianity, on the chaplain's understanding of it, does not consider these acts basic tenets of the faith. But, the chaplain's understanding is irrelevant except to the extent that it might call into question Sossamon's good faith, which it does not purport to do. Adkins was quite clear that a practice need not be central to an adherent's religion, simply important. No summary judgement evidence contradicts Sossamon's claim that these religious practices are important to his practice of Christianity. Prison chaplains are not arbiters of the measure of religious devotion that prisoners may enjoy or the discrete way that they may practice their religion.

Texas nevertheless contends that by making alternative venues available to Sossamon, he cannot claim that denying him access to the chapel and its Christian symbols substantially burdens his religious exercise. This ignores the fact that the rituals which Sossamon claims are important to him — without apparent contradiction — are now completely forbidden by Texas.[64] He may go to Christian services, but none of those services satisfy his need to perform what

---

[64] See Greene v. Solano County Jail, 513 F.3d 982, 987-88 (9th Cir. 2008) (clarifying that specific practices of a religion fall within the definition of "any exercise of religion" in RLUIPA); Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 988 (8th Cir. 2004) ("[A] substantial burden to free exercise rights may exist when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." (internal quotation marks omitted)). Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir. 2007), is not to the contrary. There, after a very extensive review of the prisoner's many requests for religious items, the prison denied the adherent a quartz crystal, but only after the prison granted the adherent "a Thor's hammer necklace; a candle in his cell; a fern tree; a number of religious 'runes' . . . as well as permission to have a designated day of the week to practice his Odinism; and permission to recognize four Odinist holidays." Id. at 1277 n.13 The denial of the quartz crystal, after a back and forth on supporting documentation, is markedly different from a wholesale denial of what Sossamon claims is core to the practice of his Christianity, at least for summary judgment purposes.

are apparently important aspects of his free exercise of Christianity, to wit: "[K]neeling at the alter [sic] in view of the Cross, to pray . . . ." and the like.

In Mayfield, we held that denying runestones to an Odinist created a genuine issue of material fact whether the adherent's religious exercise was substantially burdened.[65] Faced with a claim that all prisoners were barred from having similar items for security reasons, the court held that "TDCJ cannot use what is effectively a compelling interest argument to answer the preceding question of whether Mayfield's religious exercise is substantially burdened."[66] So too in this case: The fact that the chapel is off limits to all congregational worship does not answer whether Sossamon's religious exercise has been substantially burdened. Mayfield is even stronger support for Sossamon because the Mayfield plaintiff was permitted to possess runestones whenever a lay volunteer was available.[67] Here, Sossamon is never permitted to engage in religious worship in the chapel, at least according to the summary-judgment evidence.

Perhaps the best argument in Texas's favor is that Sossamon is simply asking to enjoy some "benefit" or to act in some way "not otherwise allowed." In debunking Texas's prison-security argument, Sossamon alleges that other prisoners are allowed to use the chapel for secular purposes. Thus, when viewed in the light most favorable to Sossamon, chapel access is clearly not something that is generally disallowed or a benefit not generally possessed by prisoners at

---

[65] 529 F.3d 599, 615-16 (5th Cir. 2008).

[66] Id. at 616.

[67] We also found that genuine issues of material fact existed as to the lay-volunteer policy, which precluded Mayfield from forming a group in which to worship without a volunteer present (volunteers came very irregularly). Id. at 613-15, 617. Texas responded that Mayfield could worship in his cell, but could not possess all of the worship items he contended were necessary. Id. We found that this alternative — solo worship — was inadequate to remedy the burden. Id.

Robertson. Congregational worship is not generally allowed in the chapel, but the key security factor — physical presence in the chapel of a group of prisoners engaged in communal activity — is allowed. The fact that the policy directly responsible for this burden bars all such religious worship (a fact that we noted was not present in Adkins) hardly makes a stronger case for finding no substantial burden when substantial secular use is made of the facility at issue.

Other RLUIPA cases in this circuit have recognized that a genuine issue of material fact exists in determining whether refusing to allow a Native American to let his hair grow out creates a substantial burden on religious exercise.[68] Failure to provide kosher food may also constitute a substantial burden.[69] It is primarily cases in which the small number of available lay volunteers makes religious services less frequent than an adherent would like (but still available on a somewhat regular basis) that a neutrally applied policy does not substantially burden religious exercise.[70] In Sossamon's case, the religious practice that he claims is important to him is denied to him at all times, whether or not volunteers are present. Accordingly, genuine issues of material fact exist on the "substantial burden" question of RLUIPA.

If there is (or could be) a substantial burden, the second RLUIPA question requires us to answer whether the substantial burden is nevertheless justified by a compelling governmental interest achieved through the least restrictive means. Texas obviously has compelling governmental interests in the security and reasonably economical operation of its prisons, but there are genuine issues of material fact as to whether vis-à-vis the chapel it has furthered those interests through the least restrictive means possible. Sossamon produced competent

---

[68] Longoria v. Dretke, 507 F.3d 898, 903 (5th Cir. 2007) (per curiam).

[69] Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007).

[70] See id. at 124-25; Adkins, 393 F.3d at 571.

summary-judgment evidence which, when viewed in the light most favorable to him, reveals that the chapel can be and is safely used for other kinds of prisoner gatherings, such as weekend-long marriage training sessions (with outside visitors), sex education, and parties for GED graduates. Texas contends that because Sossamon is allowed to attend religious services elsewhere, it has adopted the least restrictive means of accommodating his religious beliefs because Texas has not banned Christian worship entirely.[71]

This misses the point. Odinist worship was not banned in Mayfield either; the prison simply made inadequate accommodations for it. Yet we found a genuine issue of material fact existed as to whether the prison had furthered a compelling governmental interest by the least restrictive means. In contrast, Texas has banned the kind of Christian worship Sossamon contends is indispensable to the exercise of his Christianity — kneeling in front of the cross and such. Yet in its brief, Texas does not even engage the issue of other groups of prisoners using the chapel. We cannot say that there are no genuine issues of material fact about how prison security might be furthered by the chapel-use policy when Texas essentially asks us to accept the conclusional assertion that a worship service presents significantly more danger than a sex-ed class.

Neither can we see why many of the security concerns voiced by Texas cannot be met by using less restrictive means, even taking into account cost. For instance, shifts of prisoners, segregated by building, could be permitted to worship in the chapel, which would obviate concerns about the mixing of rival gangs and seating capacity. Services might be limited to days when fewer

---

[71] Even this argument fails. For example, Texas could provide a portable altar and a portable set of Christian furnishings that could be used for worship in one of the rooms where congregational services are held. Whether that would satisfy Sossamon is uncertain; he does seem to contend that services in the chapel itself, which to him is God's house, are necessary. Still, providing a portable altar and Christian symbols at the alternative worship venues would restrict his religious exercise less.

administrative personnel are in the main building (say, on Sundays), which should lessen the risk to non-security personnel of a riot and the strain of frequent prisoner movements. Some of these options might not prove feasible, and there might be as-yet-unarticulated reasons why Texas must ban worship services in the chapel while nevertheless using it for other prisoner gatherings (or that it in fact does not).[72] Those issues may be further developed on remand.

Concluding that there are genuine issues of material fact in both steps of the strict-scrutiny analysis that RLUIPA instructs us to apply, we reverse the grant of summary judgment in favor of Texas on this claim and remand for further proceedings consistent with this opinion.

3.      Section 1983 Claims

a.      Standard of Review

As with the RLUIPA claims, we review the district court's grant of summary judgment on these claims de novo, applying the same standards as the district court and construing the evidence in the light most favorable to the non-moving party.[73]

b.      Merits

Sossamon's First Amendment claim is, as a practical matter, only relevant in this appeal to his individual-capacity-damages claims under § 1983.[74] RLUIPA, by directing that we apply strict scrutiny, makes injunctive relief easier for Sossamon to obtain than it would be under the First Amendment. In Turner v. Safley, which provides the standard for establishing a First

---

[72] Perhaps only prisoners unlikely to create a security concern are permitted in these other gatherings, if the other gatherings in fact happen. This would be no excuse for failing to permit such low-risk prisoners from using the chapel for worship as well.

[73] Condrey v. SunTrust Bank of Ga., 429 F.3d 556, 562 (5th Cir. 2005).

[74] Section 1983 does not provide a cause of action against states or state employees in their official capacities for damages. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-67 (1989).

Amendment violation in the prison context, the Supreme Court held that so long as actions are "reasonably related to legitimate penological interests,"[75] they are constitutional. That is an easier showing for Texas to make than that its actions pass strict scrutiny. We also perceive no remedial differences between RLUIPA and the Constitution for purposes of an injunction. But, for the same reasons that summary judgment was improper on Sossamon's claims for injunctive and declaratory relief under RLUIPA, we perceive that there are genuine issues of material fact going to the reasonableness of Texas's conduct under even the laxer First Amendment standard. Should the distinction between the two causes of action become important going forward, the district court is free in the first instance to assess anew, after further proceedings, whether the chapel-use policy states a First Amendment violation.

As for the individual-capacity claims for damages under the First Amendment, we note that the defendants who Sossamon sued enjoy qualified immunity as government actors.[76] Whether Sossamon could establish a violation of the First Amendment in addition to RLUIPA is not a question that we resolve today. Instead, we simply note that Sossamon has pointed to no cases that render the defendants' actions — under either the cell-restriction policy or the chapel-use policy — unreasonable in light of clearly established federal law. We therefore affirm on that basis the grant of summary judgment in favor of the individual defendants for the First Amendment claims.

Although barely briefed on appeal, Sossamon also claims that the provision of special food and religious accommodations to Muslim prisoners violates the Equal Protection Clause. But, for such a claim to succeed, Sossamon

---

[75] 482 U.S. 78, 89 (1987).

[76] See Behrens v. Pelletier, 516 U.S. 299, 205-06 (1996) ("[T]he qualified immunity defense shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted) (alterations in original)).

must prove "purposeful discrimination resulting in a discriminatory effect among persons similarly situated."[77] Turner applies in the equal protection context, and not "every religious sect or group within a prison — however few in numbers — must have identical facilities or personnel."[78]

Other than alleging that Muslim prisoners receive special meals and religious accommodations (requests for which are handled under a consent decree entered into for past discrimination against them),[79] Sossamon has marshaled absolutely no evidence in support of his equal protection claim. Even without the consent decree as an explanation, he fails to allege anything but the "bald, unsupported, conclusional allegations that defendants purposefully discriminated against him" that we found inadequate in Adkins.[80] These claims are without merit, so summary judgment in favor of the defendants was proper.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Texas and the other defendants on Sossamon's RLUIPA and First Amendment claims for declaratory and injunctive relief arising out of the chapel-use policy and REMAND for further proceedings consistent with this opinion. We DISMISS AS MOOT so much of the appeal as relates to Sossamon's claims for injunctive and declaratory relief based on the cell-restriction policy with instructions that the district court VACATE those portions of its opinion as well. Otherwise, we AFFIRM the grant of summary judgment in favor of Texas and the defendants in their official and individual capacities on all (1) claims

---

[77] Adkins v. Kaspar, 393 F.3d 559, 566 (5th Cir. 2004) (internal quotation marks omitted).

[78] Id.

[79] See Brown v. Beto, No. 4:74-CV-069 (S.D. Tex. 1977).

[80] 393 F.3d at 566.

under TRFRA, the Eighth Amendment, and the Fourteenth Amendment; (2) all claims for damages under the First Amendment; (3) and all claims for damages under RLUIPA.

DISMISSED AS MOOT IN PART; REVERSED IN PART; AFFIRMED IN PART; REMANDED