**MASSACHUSETTS MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**Michael MITCHELL, Defendant.**

**Civil Action No. H–11–3811.**

United States District Court, S.D. Texas, Houston Division.

March 4, 2013.

remand question.

Amanda Sotak, Bill E. Davidoff, Figari & Davenport LLP, Dallas, TX, for Plaintiff.

Robert J. DeGroot, Attorney at Law, Newark, NJ, for Defendant.

### *MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

Pending before the Court is Plaintiff Massachusetts Mutual Life Insurance Company's ("MassMutual" or "Plaintiff") Motion for Summary Judgment ("Motion"). (Doc. No. 27.) After considering the Motion, all responses thereto, and the applicable law, the Court finds that Plaintiff's Motion should be **GRANTED.**[1]

### I. BACKGROUND

This dispute involves two life insurance policies issued by Plaintiff in the name of "J.F." (Doc. No. 28, Knudsen Decl., Exs. 1, 2.) An applicant using this name began the application process for the policies in March 2008, making various representations about J.F., including that he lived in Sugar Land, Texas, had a net worth of $4.1 million, and worked as a general manager at Circle T Machinery. (*Id.*) An individual claiming to be J.F. also subsequently completed the second part of the application process, which includes a detailed questionnaire about medical history and a paramedical examination. (Doc. No. 28, Knudsen Decl., Exs. 3, 4.) He answered "no" to questions regarding whether he had consulted a health professional or been treated for certain conditions in the past several years, or whether he had a sickness or injury for which a disability claim had been made in the past five years. (*Id.*) The individual who showed up for the paramedical examination appeared healthy, did not have visible physical limitations, and weighed about 170 pounds. (Doc. No. 28, McCutchen Dep. 23:11–24:23, 25:11–14; 26:7–10; 21:16–17; Doc. No. 28, McCutchen Dep., Ex. 2.) The applicant also identified Dr. Joel Alvear as his treating physician. (Doc. No. 28, Knudsen Decl. ¶ 4.) MassMutual obtained medical records regarding J.F. from Dr. Alvear, which revealed that the J.F. treated by Dr. Alvear had no serious physical ailments. (Doc. No. 28, Knudsen Decl., Ex. 5.) Dr. Alvear's records span from January 1, 2007 through February 29, 2008, and reveal a patient with only occasional and minor health issues. (*Id.*) Based on the applicant's representations in his application, Dr. Alvear's records, and the paramedical

---

1. On February 15, 2013, the Court filed a sealed version of this Memorandum and Order. (Doc. No. 33.) This public Memorandum and Order uses the initials, rather than the full name, of the individual identified in the life insurance policies at issue in this suit. The Court uses the individual's initials to ensure that his rights under the Health Insurance Portability and Accountability Act ("HIPPA") are not violated. This public Memorandum and Order contains no substantive changes from the Court's sealed Memorandum and Order.

examination, Plaintiff issued the life insurance policies in question, insuring the life of J.F. for $2.9 million. (Doc. No. 28, Knudsen Decl., Exs. 6, 7.)

After the policies were issued, several changes were made to the policies, including, most notably, the beneficiary was changed from Kelly Ray, who was identified in the applications as the applicant's daughter, to Defendant Michael Mitchell. (Doc. No. 28, Knudsen Decl., Exs. 1, 2, 9–14.) Michael Mitchell is identified as J.F.'s son on some of these forms, but Mitchell testified that he was J.F.'s godson. (Doc. No. 28, Knudsen Decl., Exs. 1, 2, 9–14; Doc. No. 28, Michael Mitchell Dep. 41:9–16.) At the time Michael Mitchell became the beneficiary of the life insurance policies, he had not seen J.F. in over ten years, and had not spoken to him in many years. (Doc. No. 28, Michael Mitchell Dep. 45:22–23, 46:20–25; 48:11–15, 51:3–54:9.) He did not know where J.F. was residing or what he did for a living. (*Id.* 50:3–13.) Defendant's father, Frank Mitchell, explained that he knew J.F. since childhood, and they saw each other and spoke periodically. (Doc. No. 28, Frank Mitchell Dep. 22:5–7, 22:22–25, 30:4–14.) Frank Mitchell testified that at some point, J.F. called and told him he wanted to make Michael Mitchell the beneficiary of his life insurance, explaining that "it would make him happy and that he really loves Michael." (*Id.* 54:15–55:14.)

J.F. died on June 27, 2011 in Chicago, Illinois. (Doc. No. 28, Matras Decl., Ex. 1.) On July 11, 2011, Defendant submitted a claim for the proceeds to Plaintiff, and included an original death certificate with the claim form. (*Id.*) This death certificate reveals the same date of birth and social security number as provided to MassMutual. (*Id.*) Because of discrepancies in the death certificate and other information received by MassMutual, MassMutual initiated an investigation into whether the J.F.

that had died was the same person who applied for the life insurance policies at issue. (Doc. No. 28, Knudsen Decl. ¶ 3; *compare* Doc. No. 28, Matras Decl., Ex. 1 *with* Doc. No. 28, Knudsen Decl., Exs. 1, 2, 9–14.)

MassMutual's investigation revealed that the individual who passed away had a lengthy history of serious medical problems. (*See generally* Doc. No. 28, Records from Advocate Lutheran General Hospital; Doc. No. 28, Records from Glen Elston Nursing & Rehabilitation Centre, Ltd.; Doc. No. 28, Records from Illinois Bone & Joint Institute; Doc. No. 28, Records from Rehabilitation Institute of Chicago; Doc. No. 28, Records from Saint Francis Hospital; Doc. No. 28, Records from Swedish Covenant Hospital.) These medical records indicate that the J.F. that passed away suffered from severe rheumatoid arthritis for over twenty years, had joint deformities in his fingers and knees, and was effectively wheelchair-bound since 2001. (Records from Illinois Bone & Joint Institute, at 42, 55–57, 73, 76, 85–88; Records from Advocate Lutheran General Hospital, at 638–39.) The records further reveal that in the period between November 2007 and August 2008, J.F. was confined to a wheelchair, experienced severe arthritis-related pain necessitating hospital stays on numerous occasions, and had multiple surgeries. (Doc. No. 28, Records from Swedish Covenant Hospital, at 1917, 1950, 1950A, 2106–2117, 2221, 2232–34; Doc. No. 28, Records from Illinois Bone & Joint Institute, at 17–18, 20–21, 30, 83–84; Doc. No. 28, Records from Advocate Lutheran General Hospital, at 288–30.) Although these medical records do not, on their face, contain J.F.'s social security number, they consistently include the same birth date found on the death certificate and life insurance applications. (*See generally* Doc. No. 28, Records from Advocate Lutheran General Hospital; Doc. No.

28, Records from Glen Elston Nursing & Rehabilitation Centre, Ltd.; Doc. No. 28, Records from Illinois Bone & Joint Institute; Doc. No. 28, Records from Rehabilitation Institute of Chicago; Doc. No. 28, Records from Saint Francis Hospital; Doc. No. 28, Records from Swedish Covenant Hospital; Doc. No. 28, Knudsen Decl., Exs. 1, 2; Doc. No. 28, Matras Decl., Ex. 1.) All of the medical records obtained are from hospitals and treatment centers located in or near the Chicago, Illinois area. (*Id.*)

MassMutual's investigation also revealed that J.F. who passed away on June 27, 2011 received Supplemental Security Income ("SSI") from 1982, and also received food stamps. (Doc. No. 28, Records from the Social Security Administration ("SSA"), at 58–67, 100; Doc. No. 28, Records from Illinois Department of Human Services ("IDHS").) The SSA and IDHS records also consistently include a Chicago, Illinois address for J.F. (*See generally* Doc. No. 28, Records from the SSA; Doc. No. 28, Records from IDHS.) The SSA records include the same social security number as found on the death certificate and in the applications for life insurance. (*Compare* Records from the SSA *with* Doc. No. 28, Knudsen Decl., Exs. 1, 2 *and* Doc. No. 28, Matras Decl., Ex. 1.) IDHS records reveal the same social security number found on the death certificate. (*Compare* Doc. No. 28, Records from IDHS *with* Doc. No. 28, Matras Decl., Ex. 1.)

Frank Mitchell testified that he had always known J.F. to be in reasonably good health, and that he had never seen him use a wheelchair. (Doc. No. 28, Frank Mitchell Dep. 33:12–34:6, 86:3–10.) Michael Mitchell testified that he had no knowledge of J.F.'s health, because he had not seen him in many years. (Doc. No. 28, Michael Mitchell Dep. 50:20–51:5.)

Plaintiff now moves for summary judgment seeking a declaratory judgment that it has no obligation to pay the policy proceeds because an imposter applied for and/or attended the paramedical examination. (Mot., at 27.)

## II. LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

Although ordinarily "[f]acts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party," *Nichols v. Enterasys Networks, Inc.,* 495 F.3d 185, 188 (5th Cir.2007), "this circuit has arguably articulated [a] more lenient standard for summary judgment in certain nonjury cases as opposed to jury trials." *U.S. Fid. and Guar. Co. v. Planters Bank & Trust Co.,* 77 F.3d 863, 865 (5th Cir.1996). The Fifth Circuit has noted that "[i]f a decision is to be reached by the court, and there

are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Id.* (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978)); *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir.1991) ("[I]t makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts.").

## III. ANALYSIS

Plaintiff argues it is entitled to summary judgment because insurance policies are not enforceable if the insured never actually applied for the policy. (Mot., at 24–27.) Plaintiff contends that the records from numerous hospitals and treatment centers, the SSA, and the IDHS reveal that the individual who applied for the policies and attended the paramedical examination is not the insured. (*Id.*) Defendant responds that a genuine issue of material fact exists as to whether the individual who applied for the policies and attended the paramedical examination is J.F., apparently arguing that the individual in the various hospital records obtained by Plaintiff is not the "real" J.F. (Resp., at 8.) Defendant also argues Plaintiff relies on case law that is "over eight decades old to rescind its contracts" when the modern trend across the country has been to strictly enforce incontestability clauses even if the insurance policy was issued based on material misrepresentations. (*Id.* at 10–17.)

■ The Court addresses the governing law first. Under Texas law, no contract for insurance exists if the insured did not actually apply for insurance. *See Logan v.*

*Tex. Mut. Life Ins. Ass'n*, 121 Tex. 603, 51 S.W.2d 288, 292 (Tex.1932); *see also Am. Nat'l Ins. Co. v. Brawner*, 93 S.W.2d 450, 451 (Tex.Civ.App.-Eastland 1936, writ dismissed). In *Logan*, the Supreme Court explained that, "[i]f the insured never made any application to the association for insurance, either by making the application herself, or authorizing another to do so for her, then there was never a contract between the insured and the insurer and the statute above quoted could not have application at all." *Id.* at 292. In explaining why the incontestability clause did not govern the outcome of the case, the Supreme Court stated:

> Moreover public policy requires that the clause be limited to legitimate policies actually taken out by the insured for the protection of his named beneficiary. Hence, where several persons conspired to defraud insurance company by securing policy in name of nominal beneficiary, for their own benefit, upon the life of a man who was then ill, and the policy was issued through fraud in the medical examination, and one conspirator took assignment of the policy from the nominal beneficiary, he was not a good-faith purchaser, and was not entitled to benefit of incontestability clause.

*Id.* (quoting Cooley's Briefs on Insurance (2d Ed.) vol. 5, p. 4488).

■ Defendant's argument that *Logan* is an old case and should not be followed is unavailing. This Court has already held that *Logan*, and not cases from other jurisdictions, govern the outcome of this case. (Doc. No. 20, Memorandum and Opinion, at 9–10.) The law in Texas is clear: "if the alleged insured made no application for insurance, either personally or by agent, then there was no contract of insurance, and, therefore, the incontestable clause . . . [has] no application." *Brawner*, 93 S.W.2d at 451 (citing *Logan*, 51 S.W.2d 288).

The Court agrees with Plaintiff that no genuine issue of material fact exists as to whether the individual who applied for the insurance policies in question is J.F. As Howard Knudsen, the Assistant Vice President of MassMutual explained, part of the application for larger life insurance policies includes a paramedical examination. (Doc. No. 28, Knudsen Decl. ¶ 4.) The medical records associated with the individual who passed away on June 27, 2011 reveal that he could not possibly have been the healthy and ambulatory person who appeared for the paramedical examination on March 21, 2008. (Doc. No. 28, Knudsen Decl., Ex. 4; Doc. No. 28, McCutchen Dep. 23:11–24:23, 25:11–14; 26:7–10; 21:16–17; Doc. No. 28, McCutchen Dep., Ex. 2.) J.F.'s medical records reveal that in the year surrounding the medical examination, he was confined to a wheelchair, suffered from severe arthritis-related pain necessitating hospital stays on numerous occasions, and underwent multiple surgeries. (Doc. No. 28, Records from Swedish Covenant Hospital, at 1917, 1950, 1950A, 2106–2117, 2221, 2232–34; Doc. No. 28, Records from Illinois Bone & Joint Institute, at 17–18, 20–21, 30, 83–84; Doc. No. 28, Records from Advocate Lutheran General Hospital, at 288–30.) Additionally, he had suffered from debilitating rheumatoid arthritis and joint deformities for many years before that. (*See generally* Doc. No. 28, Records from Advocate Lutheran General Hospital; Doc. No. 28, Records from Glen Elston Nursing & Rehabilitation Centre, Ltd.; Doc. No. 28, Records from Illinois Bone & Joint Institute; Doc. No. 28, Records from Rehabilitation Institute of Chicago; Doc. No. 28, Records from Saint Francis Hospital; Doc. No. 28, Records from Swedish Covenant Hospital.) Further, the records obtained by MassMutual show that the individual associated with the social security number of the insured had been receiving SSI benefits since 1982. (Doc. No. 28, Records from the Social Security Adminis-

tration, at 58–67, 100.) In order to receive SSI benefits, an individual must, among other things, be fully disabled. *See* http://www.ssa.gov/pgm/ssi.htm. The Court finds there is only one possible inference to be drawn from these facts: the individual who appeared at the paramedical examination is not the insured, and the insured did not actually apply for the life insurance policies in question.

Defendant does not present a genuine issue of material fact. He appears to argue that the individual in the medical records, SSA records and IDHS records is not the "real" J.F. (*See* Resp., at 8 ("The individual the Plaintiff asserts to be the 'real' J.F. was substantially shorter and sicker than the J.F. that Frank Mitchell knew.").) However, these records were obtained using the same social security number and date of birth as found on the death certificate Defendant relied upon, and Defendant has not presented any evidence that would suggest to the Court the records are unreliable. For instance, there is no evidence that the records were tampered with or that an individual who resided in Chicago was fraudulently using J.F.'s social security number. At the summary judgment stage, a court is only required to draw reasonable inferences in favor of the nonmovant; "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Liquid Air Corp.*, 37 F.3d at 1075 (citations omitted). This is such a case. In arguing against summary judgment, Defendant relies only on Frank Mitchell's testimony that he never knew J.F. to be seriously ill and on Dr. Alvear's medical records. (*See* Resp., at 6–9.) This evidence is far too tenuous to raise a genuine issue of material fact as to whether the healthy individual who appeared for the paramedical examination was the same

person as the J.F. who passed away on June 27, 2011 in Chicago, whose social security number turned up over two decades worth of consistent SSA records and hospital records revealing debilitating health problems.

## IV.  CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment (Doc. No. 27) is **GRANTED.**  Parties are to confer and submit an agreed proposed declaratory judgment consistent with this Memorandum and Order by March 6, 2013.

**IT IS SO ORDERED.**