# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 4, 2013

No. 12-30456

Lyle W. Cayce
Clerk

K. P., Medical Doctor; D. B., Medical Doctor; HOPE MEDICAL GROUP FOR WOMEN,

Plaintiffs - Appellees

v.

LORRAINE LEBLANC, in her official capacity as Executive Director of the Louisiana Patient's Compensation Fund Oversight Board; CLARK COSSE, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; MELANIE FIRMAN, in her official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; VINCENT CULOTTA, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; WILLIAM SCHUMACHER, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; JOSEPH DONCHESS, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; DIONNE VIATOR, in her official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; DANIEL LENNIE, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board; MANUEL DEPASCUAL, in his official capacity as a member of the Louisiana Patient's Compensation Fund Oversight Board,

Defendants - Appellants

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

## I.

In the early 1970s, a dearth of affordable medical-malpractice insurance threatened Louisiana's healthcare system. Some physicians closed their Louisiana offices, and others practiced without insurance. Louisiana responded with its Medical Malpractice Act of 1975, creating the Louisiana Patient's Compensation Fund.

The Fund served two objectives: fostering a stable market for affordable insurance and ensuring that victims of malpractice could recover for their injuries, albeit with recovery capped at $500,000, plus interest and costs.[1] In 1984, Louisiana increased compensation available to the severely injured, authorizing payment of their medical expenses as those expenses were incurred.[2]

The Malpractice Act provides three principal benefits to participating healthcare providers. First, a provider is liable only for the first $100,000 of a patient's injuries.[3] Second, providers may self-insure through the Fund; they need not obtain private malpractice insurance to participate. Third, providers are entitled to the opinion of a panel of medical experts, which must prepare a report assessing whether the provider violated the applicable standard of care.[4] That report is admissible in civil proceedings.[5]

---

[1] LA. REV. STAT. § 40:1299.42(B)(1).

[2] *Id.* § 40:1299.42(B)(1); *id.* § 40:1299.43(A)(3); *id.* § 40:1299.43(D).

[3] *Id.* § 40:1299.42(B)(2) ("plus interest . . . and costs specifically provided for by this Paragraph"); *see also id.* § 40:1299.41(D).

[4] *Id.* § 40:1299.47(A)(1)(a) (excepting arbitration); *see also id.* § 40:1299.47(B)(1)(a)(i). *But see id.* § 40:1299.47(B)(1)(b) (authorizing suit when panel fails to meet certain timing requirements); *id.* § 40:1299.47(N)(1)(b)(i) ("No party may petition a court for an order extending the twelve month period in [§ 40:1299.47(B)(1)(b)].").

[5] *Id.* § 40:1299.47(H). *But see id.* § 40:1299.47(N)(7) (opinion of *expedited* review panel is inadmissible).

All healthcare providers are eligible to participate in the Fund.[6] To participate, a provider must satisfy two requirements. First, pay an annual surcharge, geared to the risks associated with their area of practice and the claims history in that area.[7] Second, demonstrate financial responsibility to the Patients' Compensation Fund Oversight Board[8] by either depositing $125,000 of cash or its equivalent with the Board or by acquiring $100,000 of qualifying malpractice insurance.[9]

The Board has several responsibilities.[10] It is "responsible, and [has] full authority under law, for the management, administration, operation and defense of the [F]und."[11] Only the Board may make a claim against the Fund.[12] The Board also confirms whether a healthcare provider is qualified to participate in the Fund, and thus entitled to a medical-panel review before he may be sued.[13]

In 1997, Louisiana passed Act 825—the legislation at issue here.[14] The Act provides that "[a]ny person who performs an abortion is liable to the mother of the unborn child for any damage occasioned or precipitated by the abortion."[15] It defines "damage" to include "injuries suffered or damages occasioned by the

---

[6] For purposes of the Fund, Louisiana defines "health care provider[s]" as entities "licensed or certified by this state to provide health care" and related services. *Id.* § 40:1299.41(A)(10); *see also id.* § 40:1299.45(A)(2).

[7] *Id.* § 40:1299.42(A)(2); *id.* § 40:1299.44(A)(2).

[8] *Id.* § 40:1299.42(A)(1).

[9] *Id.* § 40:1299.42(E)(1).

[10] *See, e.g.*, *id.* § 40:1299.44.1(A); *id.* § 40:1299.44(D)(2)(b).

[11] *Id.* § 40:1299.44(D)(2)(a).

[12] *Id.* § 40:1299.44(B)(2).

[13] *See id.* § 40:1299.47(A)(3); *id.* § 40:1299.44(A)(5)(b); *id.* § 40:1299.44(D)(2)(a).

[14] LA. REV. STAT. § 9:2800.12.

[15] *Id.* § 9:2800.12(A).

3

unborn child."[16] And it makes explicit that a consent form "does not negate this cause of action, but rather reduces the recovery of damages to the extent that the . . . form informed the mother of the risk of the type of injuries or loss for which she is seeking to recover."[17] Finally, the Act declares that "[t]he laws governing medical malpractice or limitations of liability thereof provided in [the Malpractice Act] are not applicable to this Section."[18]   Act 825 was scheduled to take effect on August 15, 1997.[19] Several healthcare providers sought to enjoin its operation.[20] On August 14, a district court granted a temporary restraining order, later permanently enjoining the Act from taking effect.[21]

Louisiana appealed. A panel of this Court affirmed, holding that the Act was unduly burdensome of "a woman's right to have a pre-viability abortion" and unconstitutionally vague.[22] On rehearing en banc, this Court reversed, vacated, and remanded.[23] Seven of fourteen judges concluded that the suit, against the Governor and Attorney General of Louisiana, was barred by the Eleventh Amendment.[24] A majority of the Court concluded that there was no case or controversy; enjoining the Governor or Attorney General would not redress the harm caused by those actions.[25]

[16] *Id.* § 9:2800.12(B)(2).

[17] *Id.* § 9:2800.12(C)(1).

[18] *Id.* § 9:2800.12(C)(2).

[19] *Okpalobi v. Foster*, 190 F.3d 337, 341 (5th Cir. 1999), *rev'd en banc*, 244 F.3d 405 (5th Cir. 2001).

[20] *Id.*

[21] *See id.*

[22] *Id.* at 357–59.

[23] *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc).

[24] *Id.* at 408 n.*.

[25] *See id.* at 428–29; *see also id.* at 429 (Higginbotham, J., concurring).

The plaintiffs in this case are three healthcare providers. Hope Medical Group for Women is a medical clinic licensed by the Louisiana Department of Health and Hospitals to perform abortions. D.B. is the medical director of Hope Medical and has performed abortions there since 1981. K.P. performed abortions at Hope Medical from 2005 to 2007.[26] We refer to them collectively as "the Providers."

In July 2006, K.P. performed a first-trimester surgical abortion on Brittany Prudhome at Hope Medical. In June 2007, Prudhome's attorney requested the formation of a medical review panel "regarding a medical negligence claim" against K.P., D.B., and Hope Medical. The Board replied on July 5, 2007 that D.B. was a provider "qualified for acts of medical malpractice," that Hope Medical was not qualified, and that K.P. was "not qualified as it pertains to this complaint."

On July 23, 2007, Prudhome sued K.P. and Hope Medical in state court. In her complaint, she averred that she requested a medical review panel, but was informed that the defendants were "not qualified."[27] Two days later, on July 25, 2007, the Board advised Prudhome's attorney that the Board's "letter dated July 5, 2007 . . . was incorrect" and that it now believed "that the allegations contained in the complaint are not within the scope of medical malpractice as defined in the Medical Malpractice Act." Although the revised letter implies that D.B. was not entitled to a pre-suit review panel, the record does not establish whether Prudhome amended her complaint to name D.B. as a defendant.

K.P. asked the Board to reconsider its decision. The Board replied by letter that the Fund did not cover Prudhome's suit because, under subsection (C)(2) of Act 825, the Malpractice Act "is not applicable to allegations involving an

[26] K.P. stopped working at Hope Medical in 2007.

[27] A patient generally may not bring a malpractice claim against a qualified provider until she has presented her complaint to a panel. *See* LA. REV. STAT. § 40:1299.47(B)(1)(a)(i).

abortion," and K.P. was not entitled to a review panel because she paid the surcharge applicable to gynecology, rather than the higher surcharge applicable to obstetrics, and did not indicate that she was performing a certain surgical procedure.

K.P. brought a § 1983 action in federal court, suing Lorraine LeBlanc in her official capacity as Executive Director of the Board.[28] She later added D.B. and Hope Medical as plaintiffs and joined other members of the Board as defendants. (We refer to the defendants collectively as "the Board Parties.") In the amended complaint, K.P. and D.B. both alleged that at the time of Prudhome's procedure they had provided proof of financial responsibility to the Fund, paid the annual surcharges asked of them, and been certified by the Board as enrolled in the Fund.

Seeking declaratory and injunctive relief, the Providers challenged the constitutionality of Act 825 facially, as applied to physicians enrolled in the Fund "who face or will face medical malpractice claims related to abortion," and as applied to K.P. and D.B. with respect to Prudhome's claim. They advanced three theories of unconstitutionality. First, that Act 825 is vague because it imposes strict liability on abortion providers, failing to provide notice of what conduct will give rise to liability and what conduct falls outside the Malpractice Act.[29] Second, that the statute lacks a rational basis because it "subjects abortion providers, but no other physicians, to strict civil liability for their performance of legal medical procedures and it excludes abortion providers, but no other physicians, from the protections of the [Malpractice Act]." And third, that the financial costs attending the statute will "reduc[e] or eliminat[e] the availability of professional abortion services in Louisiana, thereby imposing an undue burden on plaintiffs' patients."

---

[28] *See* 42 U.S.C. § 1983.

[29] *See infra* § VI and n.81.

No. 12-30456

In March 2008, the Board agreed to convene a medical review panel for Prudhome's claims against K.P. and D.B. In a letter to Prudhome's attorney, the Board's Medical Malpractice Compliance Director indicated that "this agency has revised our records to reflect [that] . . . [K.P. and D.B.] are being reported as qualified for acts of medical malpractice under the provisions of" the Medical Malpractice Act for Prudhome's claims. The Fund and Board expressly "reserve[d] the right to deny [Fund] coverage for those allegations determined to be outside of the scope of malpractice as defined in the Medical Malpractice Act."

The letter also advised that Hope Medical was not covered by the Fund, a conclusion Hope does not contest. Three months later, Hope Medical engaged an insurance agent to acquire coverage for itself and one of its new physicians. That agent asked the Board whether Hope Medical could self-insure through the Fund. LeBlanc responded that the statute "specifically excludes elective abortions from coverage under the med mal act." Susan Gremillion, Administrative Manager of the Fund, likewise informed the agent that "[i]t is my understanding that the Malpractice Act does not cover abortions." Hope Medical later obtained private insurance, but its policy does not cover strict liability.

The Board Parties moved to dismiss the Providers' complaint, urging a want of jurisdiction under the Eleventh Amendment.[30] The district court dismissed the complaint, reasoning that "[t]he statute in this case does not charge these defendants with the obligation of enforcing anything. . . . [It] is more of a direction to a private litigant of the cause of action that is provided." The Providers appealed.

A panel of this Court reversed and remanded in *K.P. v. LeBlanc* (*K.P. I*),[31] reminding that, to invoke the *Ex Parte Young* exception to Eleventh Amendment

---

[30] They moved under FED. R. CIV. P. 12(b)(1) and 12(b)(6).

[31] *See K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) [hereinafter *K.P. I*].

immunity, a plaintiff "must demonstrate that the [sued] state officer has 'some connection' with the enforcement of the disputed act."[32] It found that connection existed, explaining that:

> By excluding abortion-related procedures from the coverage of the Med–Mal Act, [Act 825] implicitly requires the Board to differentiate between claims allowable and not allowable under the statute. By saying that only malpractice claims can be paid from the Fund, the Med–Mal Act also requires the Board to determine whether a claim presented to it has been statutorily excluded by [Act 825] from coverage. . . .
>
> In summary, the Board's role starts with deciding whether to have a medical review panel consider abortion claims and ends with deciding whether to pay them. By virtue of these responsibilities, Board members are delegated some enforcement authority.[33]

In other words, the Board enforces the Act "by applying its prohibitions."[34]

Before the panel decision, the Board agreed to convene a panel to review Prudhome's claims. Rejecting suggestions of mootness, the panel pointed to several continuing points of engagement: (1) the Board reserved its right to deny Fund coverage if it determined that Prudhome's complaint was not for malpractice; (2) the Board might decide a report was useless; and (3) the Board might need to decide "whether an amount greater than the $100,000 that the medical provider has to pay should be paid by the Fund."[35] The panel concluded that the commencement of a review panel was, at best, "a voluntary cessation of one effect of the earlier announced refusal to allow use of the Fund for abortion claims."[36]

---

[32] *Id.* at 119, 124. We expressed no opinion on whether a plaintiff must also demonstrate a "special relationship" that goes beyond "some connection," because we concluded that both standards were satisfied. *Id.* at 124.

[33] *Id.* at 124–25.

[34] *Id.* at 125.

[35] *Id.* at 121; *see also id.* at 120.

[36] *Id.* at 121.

Finally, the panel considered sua sponte the Providers' standing to bring their suit. It identified the requisite injury resulting from the initial failure to convene a medical review panel, and being exposed "to unlimited liability for the performance of abortion procedures," which "likely affects malpractice insurance rates."[37] The panel held that the Board "can unilaterally preclude the [Providers] from claiming the benefits of limited liability and independent medical review," and can "refuse to recognize the right to call on the Fund to pay a settlement or court judgment."[38] Finally, the Board could redress these injuries by convening a medical review panel and not refusing to pay a claim.[39]

On its return to the district court, the case was reassigned to another district judge. In October 2011, LeBlanc gave a sworn statement in which she stated that "[t]he medical review panel as to the claims of Brittany Prudhome was completed on September 20, 2010"—two months before the *K.P. I* panel decision. The district court granted the Providers' motion for summary judgment and denied the Board Parties' motion, resolving threshold questions of jurisdiction and justiciability as resolved on appeal—without mention of the fact that the medical review panel had been completed. The district court also held that the Act was void for vagueness, unduly burdensome, and in want of a rational basis. The court concluded that the Act, if upheld, would "significantly reduce[] the number of abortion providers in Louisiana." On March 28, 2012, the court entered final judgment and permanently enjoined the Board Parties from relying on the Act. This appeal followed.

---

[37] *Id.* at 122.

[38] *Id.* at 123.

[39] *Id.*

## II.

The Board Parties argue that the Providers lack standing and their claims, if not moot, are barred by the Eleventh Amendment and without merit. We review de novo questions of justiciability and Eleventh Amendment immunity.[40] We also review de novo a grant of summary judgment, "using the same standards as the district court."[41] Those standards require that facts be construed in the non-movants' favor, and that summary judgment be granted "when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[42]

When considering a district court's award of a permanent injunction, we review for abuse of discretion.[43] A district court abuses its discretion when it relies on clearly erroneous factual findings, relies on erroneous conclusions of law, or misapplies the law to the facts.[44]

We turn first to standing.

## III.

Article III courts have jurisdiction only over cases and controversies,[45] a requirement that a plaintiff fails to meet absent "standing—the 'personal

---

[40] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324 (5th Cir. 2009) ("We review *de novo* matters of justiciability, such as mootness, that affect our jurisdiction to hear a case."), *aff'd sub nom. Sossamon v. Texas*, 131 S. Ct. 1651 (2011); *see also K.P. I*, 627 F.3d at 124 (addressing Eleventh Amendment immunity).

[41] *Sossamon*, 560 F.3d at 326.

[42] *Id.* (internal quotation marks omitted).

[43] *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 555 (5th Cir. 2008).

[44] *Id.*

[45] *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013).

interest that must exist at the commencement of the litigation.'"[46] That interest must be "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."[47] It must exist with respect to each claim the plaintiff "seeks to press and for each form of relief that is sought."[48]

The Providers challenge the constitutionality of Act 825. Subsection (A) of that Act provides a cause of action arising from the performance of an abortion, the scope of which is set out in subsections (B) and (C)(1). Subsection (C)(2), by contrast, indicates that the section falls outside the protections of the Malpractice Act. The Providers' claim that the Act is unconstitutional is then, at bottom, two separate claims—a claim that subsection (A)'s cause of action and subsection (C)(2)'s exclusion from the Fund are unconstitutional. Each claim must be justiciable.[49]

*K.P. I* held that these Providers have standing "to seek relief from these [d]efendants."[50] The Providers contend that the earlier panel's finding of standing is now law of the case, foreclosing consideration by this panel. "The rule of the law of the case is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter."[51] With certain exceptions, the rule provides that "'an issue of law or fact *decided on*

---

[46] *Davis v. FEC*, 554 U.S. 724, 732 (2008) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

[47] *Id.* at 733.

[48] *Id.* at 734 (internal quotation marks omitted).

[49] *See id.* at 733–34 ("The fact that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(a) comes into play."); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 n.2 (1976); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.").

[50] *K.P. I*, 627 F.3d at 124.

[51] *United States v. U. S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950).

*appeal* may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal.'"[52] We first consider what the earlier panel decided.[53]

The earlier panel was not asked to consider, and did not decide, whether the Providers had standing to challenge the cause of action provision. It reviewed an appeal arising out of a district court decision that dismissed the Providers' *entire suit* on grounds of immunity. The panel's sua sponte consideration of standing likewise focused on whether the Providers could proceed *at all* against these Board Parties: it reversed the district court's dismissal because "[the Providers] have standing *to seek relief* from these [d]efendants."[54] This against the backdrop of *Okpalobi*, in which our en banc Court held that the challengers of Act 825 had sued the wrong defendants.[55]

The focus of the panel's analysis was the exclusion provision in subsection (C)(2). The panel carefully described the suit as challenging "the constitutionality of a state statute denying abortion providers the benefits of participation in the Fund."[56] And it characterized their request for injunctive relief as an attempt to prevent the Board "from using [Act 825] to prevent processing and paying of abortion-related claims"—again focusing on the denial of benefits effectuated by subsection (C)(2).[57] We abide the panel's conclusion that the Providers have standing "to seek relief from these [d]efendants" and embrace the interpretations of Louisiana law on which it relied. But neither the

---

[52] *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010) (emphasis added) (quoting *Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 2006)).

[53] *Cf. Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448 (2011).

[54] *K.P. I*, 627 F.3d at 124 (emphasis added).

[55] *See Okpalobi*, 244 F.3d at 429 (Higginbotham, J., concurring).

[56] *K.P. I*, 627 F.3d at 119.

[57] *Id.*

rule of orderliness nor the law of the case relieves us from the obligation to examine standing to challenge subsection (A), and we turn to that issue now.

We may reach the merits of the Providers' challenge to subsection (A)—the cause-of-action provision—only if any of the Providers has standing in this suit against the Board Parties.[58] None does. The Board Parties are not charged under state law with enforcing this "strict liability" provision; only a private plaintiff may bring suit.[59] And enjoining the Board Parties from "enforcing" the cause of action would not address their role in administering the Fund. It follows that declaratory and injunctive relief directed to the Board Parties will not redress the Providers' injury.[60] Accordingly, the Providers lack standing to challenge subsection (A).[61] We turn to their standing to challenge subsection (C)(2).

The amended complaint, filed in January 2008, included D.B. as a plaintiff. At that time, the Board refused to convene a review panel to evaluate Prudhome's claims against D.B. The Board did so even though no one disputed that D.B. was, in general, a qualified healthcare provider enrolled in the Fund when Prudhome contacted the Board. The Board expressly recognized as much in its response to Prudhome's inquiry. But the Board later reversed its opinion, explaining to K.P. that, pursuant to Act 825, the Malpractice Act "is not applicable to allegations involving an abortion." In short, the Board refused to provide D.B. with a review panel because of its interpretation of Act 825. The denial of this benefit was an injury-in-fact, caused by the Board and redressable

---

[58] *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012).

[59] *Cf. Okpalobi*, 244 F.3d at 428 (lead opinion) ("[I]t is the private plaintiff, bringing a private lawsuit under Act 825, who causes the injury of which the plaintiffs complain." (emphasis omitted)); *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) (en banc) (per curiam).

[60] *See Okpalobi*, 244 F.3d at 431–32 (Higginbotham, J., concurring).

[61] The Providers may, of course, defensively challenge the constitutionality of subsection (A) in the Prudhome suit.

by enjoining the Board from "enforcing" the Act.[62] There is then standing to challenge subsection (C)(2) and we turn to mootness.[63]

## IV.

There must be a case or controversy through all stages of a case;[64] "[t]he requisite personal interest that must exist at" its inception "(standing) must continue throughout its existence (mootness)."[65] Mootness, however, is more than "the doctrine of standing set in a time frame."[66] "[A] defendant cannot automatically moot a case simply by ending its [challenged] conduct once sued."[67] Instead, "'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'"[68]

The Board Parties argue that the Providers' claims "involving the medical review panel process" are moot. Specifically, they contend that a medical review panel has already completed its review, and that the Board has no say over whether conduct constitutes "malpractice." The suggested import of these contentions appears to be that the Board's involvement in the Prudhome lawsuit is complete. The Board acknowledges that "PCF coverage of the claims in the

---

[62] *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

[63] We agree with the vacated *Okpalobi* panel decision with respect to the Providers' standing to assert the rights of their patients. *See Okpalobi*, 190 F.3d at 350–53.

[64] *Already*, 133 S. Ct. at 726.

[65] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted); *see also Already*, 133 S. Ct. at 726. As with the initial determination of standing, only one plaintiff with a non-moot claim is necessary. *See Cutter v. Wilkinson*, 544 U.S. 709, 712 n.1 (2005).

[66] *Friends of the Earth*, 528 U.S. at 189 (internal quotation marks omitted).

[67] *Already*, 133 S. Ct. at 727 (internal quotation marks omitted).

[68] *Id.* at 727 (quoting *Friends of the Earth*, 528 U.S. at 190).

Prudhome lawsuit" remains unresolved, but that issue, it contends, "is not ripe because it is tentative and tenuous."

As we have explained, the Board's refusal to provide D.B. with a review panel was an injury sufficient to confer standing at the outset of this case. Because it is not clear that the Board's refusal to convene a review panel could not reasonably be expected to recur with respect to D.B., this case is not moot.

This case is not moot for an additional reason. Our *K.P. I* opinion interpreted Louisiana state law as authorizing the Board to "unilaterally preclude the Plaintiffs from claiming the benefits of limited liability and independent medical review," and to "refuse to recognize the right to call on the Fund to pay a settlement or court judgment."[69] The Board vigorously disputes that it has this authority. We cannot reach the merits of this claim; our rule of orderliness compels us to abide the interpretation of state law pronounced in *K.P. I*.[70] Accordingly, this case is not moot because the specter of unlimited liability in the Prudhome suit remains.[71] We therefore turn to the question of Eleventh Amendment immunity.

---

[69] *K.P. I*, 627 F.3d at 123.

[70] *See, e.g.*, *United States v. 162.20 Acres of Land, More or Less, Situated in Clay Cnty., State of Miss.*, 733 F.2d 377, 379 (5th Cir. 1984) (explaining that our rule of orderliness supplements normal law of the case principles). It is true, of course, that our *K.P. I* opinion addressed this case in a different procedural posture than the present appeal: a motion to dismiss rather than a motion for summary judgment. But our interpretation of state law had nothing to do with the case's posture and cannot be escaped by noting that factual allegations are treated differently when reviewing a motion to dismiss or a motion for summary judgment. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (distinguishing standards of review).

[71] Even putting aside whether D.B. was ultimately named in the Prudhome suit, there is no question that K.P. was named. She had standing to challenge the Board's reliance on Act 825, notwithstanding some dispute about whether she was entitled to the Malpractice Act's protections. *Cf. Valente*, 456 U.S. at 243 n.15. The Board contends that we may not rely on this injury to recognize standing (and avoid a conclusion of mootness) because any threat of liability fails to give rise to a ripe controversy. We disagree. K.P. filed suit *after* the Board had "enforced" Act 825 against her, *cf. Roark & Hardee LP,* 522 F.3d at 544, and there is no question that the prospect of unlimited liability has present effects on a litigant.

15

## V.

First, a few rote principles: The Eleventh Amendment proscribes federal court review of "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State."[72] The proscription also applies to suits by a citizen against her own state.[73] A suit is not "against" a state, however, when it seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal constitution.[74] That principle, the *Ex Parte Young* rule, "is based on the legal fiction that a sovereign state cannot [authorize an agent to] act unconstitutionally."[75]

*K.P. I* notwithstanding, the Board Parties contend that the Providers cannot demonstrate the "ongoing" violation of federal law that *Ex Parte Young* requires. The gist of their argument appears to be that with the panel's medical review now complete, any violation of federal law is no longer ongoing. Neither of the cases on which defendants rely supports that argument.[76] Their theory, if accepted, would work an end-run around the voluntary-cessation exception to

---

[72] U.S. CONST. AMEND. XI.

[73] *See Hans v. Louisiana*, 134 U.S. 1, 10–12 (1890).

[74] *See K.P. I*, 627 F.3d at 124.

[75] *Id.* (citing *Ex Parte Young*, 209 U.S. 123, 159 (1908)).

[76] In *Green v. Mansour*, there was not even a "claimed continuing violation of federal law." 474 U.S. 64, 73 (1985). The *Green* plaintiffs conceded that their request for the type of injunctive relief at issue here was moot. *Id.* at 68–69. And in *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992), the Supreme Court acknowledged that "*Young* establishes that injunctive relief was available," *id.* at 381, but objected to the scope of the injunction ordered, evidently based on ordinary principles of equitable remedies, *see id.* at 382–83. Moreover, *Trans World Airlines* involved an injunction based on laws that a State had not thought applicable and might not think applicable. *See id.* at 381–82. This case, by contrast, involves a single statute on which the Board has already relied.

mootness where a state actor is involved.[77] And in any event, as *K.P. I* previously found, the threat of unlimited liability is ongoing because the Board has expressly relied on Act 825 before.

The Board Parties also invoke the *Pennhurst* limitation on *Ex Parte Young*.[78] "*Pennhurst* stands for the proposition that the Eleventh Amendment bars suits . . . where state law imposes an affirmative duty upon the official, and it is that duty that provides the basis for the injunctive relief sought."[79] The Providers here seek to enjoin the Board Parties from relying on Act 825 based on allegations that Act 825 violates the federal constitution. Unlike *Pennhurst*, the Providers did not ask that the Board Parties be required to take particular actions based on state law—they asked that the Board Parties be *prevented* from taking particular actions based on *federal* law.[80] Accordingly, the Eleventh Amendment does not bar the Providers' challenge to subsection (C)(2).

We therefore turn, finally, to the merits of that challenge.

## VI.

The parties dispute whether subsection (A) imposes strict liability on abortion providers. For the sake of argument, we assume that it does.[81] But

---

[77] *Cf. Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308–12 (11th Cir. 2011).

[78] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).

[79] *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 966 n.5 (5th Cir. 1993) (emphasis removed); *see also id.* at 965–66.

[80] *Cf. Pennhurst*, 465 U.S. at 124–25 ("The Court of Appeals upheld the judgment of the District Court solely on the basis of Pennsylvania's MH/MR Act. We hold that these federal courts lacked jurisdiction to enjoin petitioner state institutions and state officials on the basis of this state law.").

[81] We acknowledge the argument that the statute is little more than a state effort to serve its interest in the potentiality of life by putting bite in the common law duty of informed consent. The statute, while making no reference to a standard of care, removes liability for damages flowing from disclosed risks. Nor, the argument continues, does its language preclude

because we consider only the constitutionality of subsection (C)(2), the Providers are still not entitled to the relief they seek. We consider in turn each of their arguments: that subsection (C)(2) denies them equal protection of the laws; that it places an undue burden on women's right to choose; and that it is unconstitutionally vague.

## A.

The Providers contend that Act 825 lacks a rational basis and therefore violates the Equal Protection Clause of the Fourteenth Amendment.[82] Our focus is on subsection (C)(2). To prevail, the Providers must demonstrate that the subsection is not "rationally related to [a] legitimate governmental goal;"[83] that the subsection is not rationally related to the promotion of informed consent and that hostility to abortion procedures is not a legitimate goal. They have not done so, as subsection (C)(2) is rationally related to the promotion of informed consent—an unquestionably legitimate end.[84]

In 1995, Louisiana amended its Woman's Right to Know Act to ban abortions "performed or induced without the voluntary and informed consent"

---

a judicial reading, as a matter of avoiding constitutional shoals, as being written against the developed doctrine of informed consent to implicitly accept state law principles of causation and duty. We need not and do not reach the argument.

[82] The Providers do not contend that heightened scrutiny is appropriate.

[83] *Stefanoff v. Hays Cnty., Tex.*, 154 F.3d 523, 526 (5th Cir. 1998) (per curiam). Plaintiffs bear the burden of showing irrationality; the Board need not demonstrate that Act 825 is rational. *See Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 504 (5th Cir. 2006).

[84] *See, e.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 66–67 (1976); *Margaret S. v. Edwards*, 794 F.2d 994, 998 (5th Cir. 1986) ("[T]here is no question about the state's strong interest in ensuring that physicians obtain the patient's informed consent before performing abortions."); *cf. Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (noting government interest in protecting integrity of medical profession). We need not consider whether hostility to abortion procedures is a legitimate goal.

of the patient.[85] The Act declared abortions *not* knowing and voluntary, outside of medical emergencies, unless the woman received several pieces of information.[86] Violations could be punished by both civil and criminal penalties,[87] though "[a]ny physician who complie[d] with the provisions of th[e] Section [could] not be held civilly liable to his patient for failure to obtain informed consent to the abortion under th[e] Section."[88] The Right to Know Act was in effect, unamended, when the legislature passed Act 825.

Against the backdrop of the Right to Know Act, the Providers contend that Act 825 does not further the goal of informed consent. The Right to Know Act, they claim, "establishes specific requirements" for informed consent, to which Act 825 adds nothing particular. But this lack of particularity is not irrational. The Right to Know Act, at the time Act 825 was passed, threatened both criminal and civil penalties under certain circumstances. A legislature could rationally hesitate to augment the list of information that, if omitted, could trigger these consequences. At the same time, a legislature could seek to incent physicians to uncover the risks of abortion and disclose those risks—even low-probability risks—to their patients. Subsection (C)(1) furthers that incentive regardless of whether subsection (A) imposes strict liability: "The signing of a consent form by the mother prior to the abortion . . . reduces the recovery of damages to the extent that the . . . consent form informed the mother of the risk

---

[85] *See* ABORTION—INFORMED CONSENT (WOMAN'S RIGHT TO KNOW)—TWENTY-FOUR HOUR WAITING PERIOD; MEDICAL EMERGENCIES; PENALTIES, 1995 La. Sess. Law Serv. Act 648 (H.B. 2246) (West) (addressing LA. REV. STAT. § 40:1299.35.6B (1995)).

[86] *See id.*

[87] *See* LA. REV. STAT. §§ 40:1299.35.6(F) (1995) (criminal), 40:1299.35.6(G) (1995) (civil); *see also id.* § 40:1299.35.6(H) (2012) (criminal).

[88] *Id.* § 40:1299.35.6(H) (1995) ("Any and all other rights and remedies are preserved to the patient."); *see also id.* § 40:1299.35.6(I) (2012).

of the type of injuries or loss for which she is seeking to recover."[89] If subsection (C)(2) did not limit Fund coverage, physicians could trust that their liability was capped at $100,000, limiting their incentive to learn of and disclose low-probability, high-severity risks related to the performance of abortions.

Subsection (C)(2) is broad given the history of the Malpractice Act and the sweep of the Right to Know Act. But it is still distinct from the Amendment at issue in *Romer v. Evans*.[90] That provision "identifie[d] persons by a single trait and then denie[d] them protection across the board"—a singular exclusion of a class of persons' basic rights as citizens.[91] The Act at issue here denies protection only for injuries arising from a particular type of procedure. A person who performs those procedures is not disqualified from otherwise participating in the Fund, just as a woman who exercises her right to undergo such a procedure is not disqualified from recovering from the Fund for unrelated malpractice. Thus, while we must still consider whether subsection (C)(2) imposes an undue burden on a woman's right to choose, it is not tainted by irrational animus.

## B.

The Supreme Court has held that every woman has the right "to choose to have an abortion before viability and to obtain it without undue interference from the State."[92] A state law unduly burdens that right when it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[93] "A statute with this purpose is invalid

---

[89] *Id.* § 9:2800.12(C)(1).

[90] 517 U.S. 620 (1996).

[91] *Id.* at 633.

[92] *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992).

[93] *Id.* at 877 (plurality opinion); *see also Marks v. United States*, 430 U.S. 188, 193 (1977) (holding that narrowest position in support of the judgment is the Court's holding).

because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it."[94] "And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."[95]

We inquire whether subsection (C)(2) "place[s] a substantial obstacle" in women's paths. In answering this question, we deploy the distinction between not providing benefits and restricting choice.[96]

By subsection (C)(2), a healthcare provider sued under subsection (A) is not entitled to the benefits of the Malpractice Act. This exemption may make it difficult—perhaps prohibitively difficult—for those providers to obtain the relevant insurance. But while this difficulty may result from subsection (A)'s cause of action, subsection (C)(2)'s limitation on the Malpractice Act is merely a "means of unequal subsidization of abortion and other medical services."[97] And while "government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those" obstacles, like Louisiana's dearth of affordable insurance, that are "not of [the government's] own creation."[98] Of course, in some sense, Louisiana's healthcare market is a function of the laws operative in that state. But that is also true, in some sense, of the "[i]ndigency" described in *Harris v. McRae* as an obstacle for which the government is not responsible.[99] Though some have criticized the *Maher-McRae*

---

[94] *Casey*, 505 U.S. at 877.

[95] *Id.*

[96] *See Harris v. McRae*, 448 U.S. 297 (1980); *Maher v. Roe*, 432 U.S. 464 (1977).

[97] *McRae*, 448 U.S. at 315.

[98] *Id.* at 316.

[99] *Id.*

line of cases as formalistic,[100] the cases are the long-standing law of the Supreme Court and we must apply them.[101]

We turn finally to the vagueness question.

## C.

The Providers argue that subsection (A)'s cause of action is unconstitutionally vague, but, as we explained above, they lack standing to pursue that claim against these defendants. The Providers do not contend that subsection (C)(2) is unconstitutionally vague.

**\* \* \***

We REVERSE the judgment of the district court striking down subsection (C)(2) of Act 825. We VACATE its judgment regarding subsection (A) and dismiss that claim for want of jurisdiction.

---

[100] *See, e.g.*, Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1440 (1989).

[101] We note that excluding subsection (A)'s cause of action from Fund coverage does not "seek to leverage funding to regulate speech outside the contours of the [Fund] itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013); *cf. Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").